JAMES M. CAMINADE

V.

COMMONWEALTH OF VIRGINIA

Record No. 841787

January 17, 1986

Present: All the Justices

*James A. Segall* for appellant
*Russell C. Williams, Assistant Attorney General (William G. Broaddus, Attorney General*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

James M. Caminade was convicted, in a bench trial, of three statutory burglaries and one attempted burglary. We granted an appeal limited to the question whether the evidence was sufficient to support his convictions of the three burglaries. We conclude that it was sufficient to support two of the convictions but insufficient to support the third.

During September and early October 1983, the police had received complaints of 68 burglaries and attempted burglaries in the Denbigh area of Newport News. The *modus operandi* seemed uniform: all were committed between approximately midnight and dawn, all involved forced entries of side or rear doors and windows, each involved a series of adjacent homes in a neighborhood,

broken into on the same night, and nothing but cash was taken in any of the burglaries.

On the morning of the burglary of Helen Cox's home, her next-door neighbor, Gary Faulkner, left his house at 5:30 a.m. to go jogging. He noticed an unfamiliar maroon Pontiac parked in front of his house, under an overhanging willow tree. Later, when informed that the Cox house had been broken into about that time, he recalled that the first three letters of the Pontiac's license plate were DBU. He had also heard a noise from the direction of the Cox house "like a board hitting another board or [the] ground." When he returned from running, 30 to 40 minutes later, the Pontiac was gone. He reported these facts to the police.

Four weeks earlier, an attempt had been made to break into the house of Lana Dawn Bolton. The burglar had been intercepted by William Webster, the boyfriend of Mrs. Bolton's teenage daughter, who was visiting the girl at the time. Seeing a flashlight at a rear window, Webster, thinking it might be "one of her other boyfriends," went outside and wrestled the intruder to the ground. The intruder said, "I must have the wrong house." Webster testified, "I let him go because I didn't have any idea what he was doing there." Webster remembered that the intruder had driven away in a car he thought was a "red Camaro, . . . red with black on the back of it." He said: "I didn't get a clear picture of the license plate, but [it] looked like DDD, close as I can picture." The next morning, the Boltons found a screwdriver and a prying tool at the scene of the struggle.

On October 2, 1983, a police officer reported a traffic stop of a car which matched Faulkner's description. Its ownership was traced to Caminade, who was working on the car when he was arrested. It turned out to be a red Pontiac Trans Am with black louvers over the rear window and the license number DBU 655. An array of six photographs, including one of Caminade, was shown to William Webster, who immediately identified Caminade as the intruder he had wrestled to the ground outside the Bolton house.

Caminade was arrested, advised of his rights, taken before a magistrate, and questioned concerning the reported burglaries. He first denied involvement, then inquired about a prosecutorial "deal," and eventually told the police that he had completed or attempted 80 to 90 burglaries during the time period under investigation. Caminade said that he was in financial difficulties and

needed cash to fend off his creditors. At Caminade's suggestion, he directed the police on a tour of the various neighborhoods he had "done" and made diagrams of the routes he had followed on foot through each neighborhood after parking his car. He was able to state the approximate dates he had been in each neighborhood and to show where he had entered it and parked his car. He had worked from the backs of the houses, however, in total darkness, and therefore could not identify the specific houses he had broken into. He said that he had worked with screwdrivers and an ordinary kitchen knife, forcing his way into the rear doors or windows of several adjacent houses each night. Most of the time he took only cash and remembered that he had taken $250 from one particular house. He also remembered that four adjacent houses he had broken into had a lake behind them and that he had walked between the backs of the houses and the lake.

Although Caminade's cooperation enabled the police to close their files on many reported offenses, he was indicted for only four: the attempted burglary of the Bolton house, the statutory burglary of the Cox house, and additional statutory burglaries of houses belonging to parties named Olson and Sain. Notwithstanding his earlier cooperation, he entered pleas of not guilty, was convicted, and appeals. We refused an appeal of the Bolton attempted burglary. We shall, therefore, confine our consideration to the evidence relating to the Cox, Olson, and Sain burglaries, including the background set forth above, in the light most favorable to the Commonwealth.

Caminade was convicted under Code § 18.2-91. The Commonwealth was required to prove, in each case: (1) an entry of a dwelling house; (2) in the nighttime; (3) with or without breaking; (4) with the intent to commit larceny; and (5) by Caminade. Caminade's appeal focuses primarily on the last element. He argues that the Commonwealth's proof of criminal agency was insufficient.

## I. The Cox Burglary.

About 5:45 a.m. September 27, 1983, Helen Cox noticed that five dollars she had left on a downstairs table, before retiring to bed the previous evening, was missing. Later, she found evidence that the paint on her back door had been scraped near the latch. Her son noticed that the back door bore pry marks, apparently from a screwdriver, and that the back screen door had been

propped open. That evening, the Coxes determined that a total of seven dollars was missing. As stated above, the Coxes' neighbor, Gary Faulkner, on the same morning, had noticed a car parked next door to the Cox house which closely corresponded with the description of Caminade's car. While the car was present, shortly before the money was missed in the Cox house, Faulkner heard sounds from the Cox house which the fact finder might conclude emanated from a breaking and entry. Caminade's admissions to the police placed him in the Cox neighborhood, committing burglaries, within a range of days which included the date of the offense. The circumstances surrounding the offense were consistent in all respects with Caminade's admitted *modus operandi*.

The foregoing combination of direct and circumstantial evidence was more than sufficient to prove both *corpus delicti* and criminal agency. It furnishes adequate support for the conviction.

## II. The Olson Burglary.

On September 30, 1983, at 6:00 a.m., William Olson came downstairs and found his wallet "dumped all over the floor." A window, which opened by sliding horizontally, had been opened, the screen had been removed and thrown on the ground outside, a chair and a plant which had been inside the window had been moved, and moist earth had been tracked on the floor. Exactly $250.00 in cash had been taken from his wallet, but other valuables nearby, including a watch and gold chain, were untouched. Caminade's admissions to the police placed him in Olson's neighborhood, committing burglaries, within a range of days which included the date of the offense. The circumstances surrounding the offense were consistent in all respects with Caminade's admitted *modus operandi*. In addition, Caminade mentioned that he had taken exactly $250.00 from one house. That particular amount was unique to the Olson burglary. We conclude that this combination of direct and circumstantial evidence was sufficient to prove both *corpus delicti* and criminal agency, and adequately supports the conviction.

## III. The Sain Burglary.

Willie Joe Sain testified that on September 23, 1983, he returned home about 8:00 a.m. after working a night shift. He found that his side garage door had been "pried up by a round

object" which he thought was probably a screwdriver. He began to testify to statements by his wife concerning cash missing from her wallet, but a hearsay objection was sustained. The Commonwealth offered no further evidence except Caminade's admissions.

The Commonwealth relies upon Caminade's statements that he was in the Sain neighborhood, committing burglaries, within a range of days which included the date of the offense, and that a lake lay behind four of the houses he had entered. It is undisputed that a lake lies behind the Sain house. This proof, the Commonwealth argues, is sufficient to support the conviction. We do not agree.

Caminade's statements were admissions, not confessions, because they did not furnish all facts necessary for conviction.

> [A] "confession" is generally defined as a statement admitting or acknowledging all facts necessary for conviction of the crimes at issue. An "admission," on the other hand, consists of an admission or acknowledgment of a fact or facts tending to prove guilt but falling short of an admission to all essential elements of the crime.

E. Cleary, McCormick's Handbook of the Law of Evidence, § 144, at 362 (3d ed. 1984) (footnotes omitted).

It was, of course, incumbent upon the Commonwealth to prove both *corpus delicti* and criminal agency. Even though the admissions might furnish circumstantial evidence from which a fact finder might infer criminal agency, after *corpus delicti* has been established by other evidence, the admissions furnish no proof of *corpus delicti* in themselves. The record is devoid of evidence (1) that an entry was actually made into the Sain house, and (2) by a person having the requisite intent. Caminade's admissions could not supply these crucial elements because he simply did not know which houses he had entered. Like any other elements of a crime, each of these must be proved beyond a reasonable doubt and not left to speculation. Sain's testimony furnished evidence only of tool marks on a garage door.

> The rule in criminal cases is that the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, avails nothing unless the *corpus delicti*, the fact that the crime has been actually perpetrated, be first

established. So long as the least doubt exists as to the act there can be no certainty as to the criminal agent.

*Maughs v. City of Charlottesville,* 181 Va. 117, 121, 23 S.E.2d 784, 786 (1943) (quoting *Poulos v. Commonwealth,* 174 Va. 495, 500, 6 S.E.2d 666, 667 (1940)). *See also Phillips v. Commonwealth,* 202 Va. 207, 211, 116 S.E.2d 282, 284-85 (1960). Thus, the evidence is insufficient to support the conviction.

For the foregoing reasons, we will affirm Caminade's convictions of the Cox and Olson burglaries, reverse his conviction of the Sain burglary, dismiss the indictment for the Sain burglary, and enter final judgment here in all three cases.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*