HUMPHREYS, J.,
dissenting.
I believe that Code § 18.2-57, when read in conjunction with Code § 15.2-1726, entitles these federal officers to “the same powers, rights, benefits, privileges and immunities while acting in the performance of their duties,” including the fullest protection of the law when carrying out those duties. As a result, the statutory definition of “law-enforcement officer” contained in Code § 18.2-57 must therefore also encompass federal officers who have entered into, and are acting pursuant to, a contractual mutual assistance arrangement with a state or local law enforcement agency. Accordingly, I respectfully dissent.
I.
South contends that, because the United States naval base police officers were not “law-enforcement officers” as defined *257 by Code § 18.2-57, she cannot be convicted of the offense of assaulting a police officer. The majority correctly points out that “[njeither naval base officer was an employee of a police department or sheriffs office that was part of, or administered by, the Commonwealth or any local government. The Navy employed, paid, and controlled both federal officers.” However, I disagree with the majority’s conclusion that the ability of the Commonwealth to charge South with the enhanced assault charge rises and falls solely with the statutory definition provided in Code § 18.2-57(C).
Clearly, federal officers are not specifically listed in Code § 18.2-57(C). And, without further analysis, it would seem that the principle of “expressio unius est exclusio alterius” applies, limiting us to the list of individuals delineated within that Code section. However, because the Commonwealth introduced unchallenged evidence of a contractual agreement between the City of Norfolk and the federal government, I believe that this Court must also take into consideration the provisions of Code § 15.2-1726 when determining whether these officers are afforded the privilege of claiming “special victim status” under Code § 18.2-57.[9]
A. APPLICABLE RULES OF STATUTORY CONSTRUCTION WHEN CONSIDERING MULTIPLE STATUTES
When this Court is faced with an issue of statutory construction, we are, as the majority acknowledges, bound by the “plain meaning rule.” See Brown v. Lukhard, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985). In other words, if the statute is clear on its face, we need not resort to rules of statutory construction, but rather, we must give full effect to the plain meaning of the words chosen by the legislature. Id.[10] Howev *258 er, if the statutory language is ambiguous, or if two statutes seem to be in conflict, as is the case here, we must employ the rules of statutory construction. Id.; see also Buzzard v. Commonwealth, 134 Va. 641, 653, 114 S.E. 664, 667 (1922).
When resorting to the rules of statutory construction, our overriding inquiry focuses upon ascertaining the intention of the lawmakers. Buzzard, 134 Va. at 653, 114 S.E. at 667. The “intention [of the legislature] must be gathered from the words used, but unreasonable or absurd results must not be reached by too strict adherence to literal interpretation.” Id. Statutes must be considered together, and the literal meaning of separate statutes, if in conflict, “must yield to a reasonable and fair interpretation to be gathered from the context, the subject matter and the reason and spirit of the law.” Id. Moreover, “[t]he doctrine of pari materia teaches that statutes are not to be considered as isolated fragments of law, but as a whole, or as parts of a great, connected homogenous system, or a simple and completed statutory arrangement.” Commonwealth v. Wallace, 29 Va.App. 228, 234, 511 S.E.2d 423, 425 (1999) (quoting Moreno v. Moreno, 24 Va.App. 190, 197, 480 S.E.2d 792, 796 (1997)) (internal quotations omitted). Therefore, “proper construction seeks to harmonize the provisions of the statute both internally, and in relation to other statutes.” Mayhew v. Commonwealth, 20 Va.App. 484, 489, 458 S.E.2d 305, 307 (1995) (citations omitted) (emphasis added).
B. READING CODE § 18.2-57 IN CONJUNCTION WITH CODE § 15.2-1726
In this case, the Commonwealth produced evidence — -without objection or other evidence to the contrary — that the City *259 of Norfolk and the federal government maintained a mutual aid agreement, pursuant to state law, by which Norfolk Naval Base police officers had the authority to enforce and uphold the laws of the Commonwealth.
According to Code § 15.2-1726,
Any locality may, in its discretion, enter into a reciprocal agreement with any other locality, any agency of the federal government exercising police powers, police of any state-supported institution of higher learning appointed pursuant to § 23-233, or with any combination of the foregoing, for such periods and under such conditions as the contracting parties deem advisable, for cooperation in the furnishing of police services.... Subject to the conditions of the agreement, all police officers, officers, agents and other employees of such consolidated or cooperating police departments shall have the same powers, rights, benefits, privileges and immunities in every jurisdiction subscribing to such agreement, including the authority to make arrests in every such jurisdiction subscribing to the agreement; however, no police officer of any locality shall have authority to enforce federal laws unless specifically empowered to do so by statute, and no federal law-enforcement officer shall have authority to enforce the laws of the Commonwealth unless specifically empowered to do so by statute.
(Emphasis added). In other words, a locality may enter into a mutual aid agreement with the federal government, and absent any language in the agreement to the contrary, the statute itself gives the federal officers all “powers, rights, benefits, privileges and immunities,” including the power to arrest, that are conferred upon the law enforcement officers of the contracting jurisdiction. (Emphasis added).
However, the majority offers several reasons why Code § 18.2-57, in combination with Code § 15.2-1726, does not provide these officers with the privilege to charge South with the enhanced assault charge. For the reasons that follow, I disagree with each.

*260
1. The Existence of a Mutual Aid Agreement

Although the record is clear that the federal officers had arrest powers, the majority questions the existence of an agreement between the City of Norfolk and the federal government, stating, “[w]e assume, without deciding, a ‘reciprocal agreement’ exists between the City of Norfolk and the United States Navy.”[11] The majority then goes on to state that even if an agreement does, in fact, exist, “Code § 15.2-1726 cannot, by itself, confer arrest authority on federal officers to enforce state law.”
However, the majority’s interpretation of Code § 15.2-1726 joins two different portions of the statute together that — when read in accordance with the “plain-meaning rule” — the legislature clearly intended to make distinguishable. Specifically, the power to arrest and the power to enforce the laws of the Commonwealth are two different propositions. See Lukhard, 229 Va. at 321, 330 S.E.2d at 87 (addressing the “plain-meaning” rule); see also Code § 15.2-1726.
The majority argues that Code § 15.2-1726 states that, no matter what the mutual aid agreement may say, “ ‘no federal law-enforcement officer shall have authority to enforce the laws of the Commonwealth unless specifically empowered to do so by statute.’ ” This may be true. However, because Code § 15.2-1726, does, by itself, confer upon these officers “the authority to make arrests” when a mutual aid agreement exists, we need not even go so far as to ask whether these officers had the power “to enforce the laws of the Commonwealth.” Rather, because the officers had the power to arrest, which derived from a mutual aid agreement between the City *261 of Norfolk and the federal government, they had the same “powers, rights, benefits, privileges and immunities” of their counterparts employed directly by the Commonwealth. (Emphasis added).
Therefore, in viewing this evidence in the light most favorable to the Commonwealth, I believe this Court is compelled to find that the federal officers’ ability to arrest South was established pursuant to a mutual aid agreement between the City of Norfolk and the federal government, as allowed by Code § 15.2-1726.

2. Failure to Offer the Agreement Into Evidence

The majority also suggests that, because the Commonwealth failed to offer the actual agreement between the City of Norfolk and the federal government into evidence, “we cannot assume anything in it purports to transform the federal officers South assaulted into employees of a police department or sheriffs office which is part of or administered by” the Commonwealth. In other words, the majority contends that we cannot consider the agreement because the Commonwealth did not satisfy its burden of proof with regard to the charged offense.
Although it is true that, “[t]o satisfy the due process requirements of the Federal Constitution, the prosecution must bear the burden of proving all elements of the offense beyond a reasonable doubt,” Stokes v. Warden, Powhatan Correctional Center, 226 Va. 111, 117, 306 S.E.2d 882, 886 (1983) (quoting In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)), and while it would certainly have made our task easier had the Commonwealth offered the agreement as an exhibit, I disagree with the majority’s implicit conclusion that the Commonwealth completely failed to prove the existence of such an agreement. Specifically, the Commonwealth presented uncontroverted testimony, by both arresting officers, that a cooperative agreement existed that gave them the power to arrest and issue summons by the City of Norfolk. Moreover, in ruling on the motion to strike, the trial court stated,
*262 [T]hey operate under permission from the City of Norfolk— this political subdivision that these events occurred in — to lawfully execute and issue summons and arrests within this jurisdiction. That has been unchallenged____I think the testimony of the officers effectively said just this — they didn’t get into all the details because it wasn’t charged. They said they got authority from the City, and they have a mutual [aid] agreement with the City, and there is no challenge to that by the evidence, and therefore, I will deny your motion to strike.
The Commonwealth’s failure to introduce the agreement itself, although arguably in contravention of the best evidence rule, does not, in the absence of an objection to that effect, preclude either the trial court or this Court from finding that the evidence establishes that the contract did, in fact, exist.
In Virginia, the best evidence rule provides that “where the contents of a writing are desired to be proved, the writing [the primary evidence] itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted.” Randolph v. Commonwealth, 145 Va. 888, 889, 134 S.E. 544, 546 (1926); Butts v. Commonwealth, 145 Va. 800, 816, 133 S.E. 764, 769 (1926). If the trier of fact concludes with reasonable certainty that the document existed and that it is unavailable for admission at trial, testimony about its contents is admissible, and any remaining disputes center on the weight to be given the evidence, not its admissibility. See, e.g., Foley v. Commonwealth, 8 Va.App. 149, 164-65, 379 S.E.2d 915, 924 (1989). However, the rules of evidence require counsel to object in order for the court to apply this rule. See, e.g., Ohree v. Commonwealth, 26 Va.App. 299, 494 S.E.2d 484 (1998). In this case, however, South failed to raise any objection to the introduction of the officers’ testimony regarding the agreement between the City of Norfolk and the federal government. And, although such an objection may have been well taken, it is not the province of this Court to consider on appeal an issue that was not preserved below. See Rule 5A:18. Thus, absent any objection from defense counsel, or any affirmative evidence that the contract did not *263 exist, I would hold that the Commonwealth presented sufficient evidence from which the trial court could infer that the agreement existed.
Therefore, in viewing this evidence in the light most favorable to the Commonwealth as required by the appellate standard of review, we can and should find that a contractual agreement existed that provided these officers with the same “powers, rights, benefits, privileges and immunities” as their colleagues that are employed directly by the Commonwealth or its political subdivisions. Code § 15.2-1726 (emphasis added).

3. The Terms of the Contractual Relationship

The majority also questions “whether a reciprocal agreement under Code § 15.2-1726 can contractually confer upon a federal officer the ‘privilege’ of special victim status,” and, even if the agreement did exist, whether it would “transform” the federal officers into an employee of the Commonwealth for purposes of Code § 18.2-57.
However, nothing in the statute requires such a “transformation” in order for the contracting officer to receive the “rights, benefits, privileges and immunities” that the statute provides. Id. (emphasis added). Rather, the contractual relationship is a mechanism by which a local entity, in this case, the City of Norfolk, in conjunction with agencies of the federal government, can efficiently and effectively cooperate in the furnishing of police services, while simultaneously providing the officers of the contracting agencies with the same authority and benefits as their local counterparts. These benefits are, as the statute indicates, the same “rights, benefits, privileges and immunities” of the local officers. Id. (emphasis added).
Although the majority suggests that these terms are not “self-defining,” and are usually used to “describe the common law and statutory powers to seize persons and property, the protection from legal liability accompanying the performance of official duties ... and legal entitlements of the kind,” we *264 must begin our interpretation of every statute by discerning the plain meaning of the words within it. See Lukhard, 229 Va. at 321, 330 S.E.2d at 87.
According to Black’s Law Dictionary 1215 (7th ed.1999), a privilege is “a special legal right, exemption, or immunity granted to a person or class of persons.” (Emphasis added). In giving effect to the plain meaning of the words chosen by the legislature, as we must, the legislature’s use of the word “privilege” connotes that this statute provides contracting officers with “special legal right[s].”[12] Id. Clearly, I agree with the majority that, “it is our duty to take the words which the legislature has seen fit to employ and give to them their usual and ordinary signification, and having thus ascertained the legislative intent, to give effect to it.” Saville v. Va. Ry. & P. Co., 114 Va. 444, 452-53, 76 S.E. 954, 957 (1913). To that end, we must give effect to the meaning of the word “privilege” when Code § 18.2-57 and § 15.2-1726 are read together.
Accordingly, I would hold that the “special legal rights,” bestowed upon the federal officers by Code § 15.2-1726 by virtue of the cooperative agreement, give these federal officers the “privilege” of special victim status under Code § 18.2-57, thus providing the same level of deterrent effect conferred by the enhanced penalty for those who assault the law enforcement officers of the Commonwealth. I respectfully suggest that the legislature did not intend that these officers would be afforded the “special legal right” of claiming protection from legal liability accompanying the good faith performance of their duties, but in turn would not be afforded the “special legal right” of claiming the special victim status available under Code § 18.2-57.

Ip. Jurisdiction

Lastly, in footnote 2, the majority seems to suggest that deterring violence against federal officers, who are contractu *265 ally authorized to enforce state law, may only be done through the federal court system pursuant to 18 U.S.C. § 111(a)(1). Although South could certainly have been charged in federal court with the crime of assaulting a federal officer, nothing prevents the Commonwealth from pursuing a cause of action that is a violation of state law. More specifically, where a state shares concurrent jurisdiction with the federal government over an area where a state cause of action arises, that state court is the proper forum for deciding the case. See, e.g., Gay v. Commonwealth, 10 Va.App. 229, 230-31, 391 S.E.2d 737, 738 (1990) (holding the Virginia Beach Circuit Corat had concurrent jurisdiction over Little Creek Naval Amphibious Base for traffic violations). Accordingly, in contrast to the assertion made by my colleagues, I would hold that the Commonwealth has not only the jurisdiction to pursue this claim, but also an overriding interest in protecting the officers it contracts with to uphold the laws of the Commonwealth.
II.
In the present case, we are presented with two statutes. Although South urges us to strictly construe the meaning of “law-enforcement officer” as defined solely by Code § 18.2-57, this Court must also consider Code § 15.2-1726. In reading these two statutes together, so as to discern “the true intention of the Legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the Legislature,” Northrop v. Richmond, 105 Va. 335, 339-40, 53 S.E. 962, 963 (1906) (internal quotations omitted), I conclude that the General Assembly intended to give federal officers — such as those involved in this case — the same level of protection from criminal acts as is afforded their law enforcement colleagues employed by the Commonwealth, its cities, and its counties. Because I would affirm the convictions, I respectfully dissent.

. The majority uses the term "special victim status” to refer to the "privilege" conveyed to law-enforcement officers under Code § 18.2-57. For consistency, I will adopt this terminology.

. Under the "plain meaning” rule, "if statutory language is not ambiguous but has a usual and plain meaning, rules of construction do not *258 apply and resort to legislative history is both unnecessary and improper.” Marsh v. Richmond, 234 Va. 4, 11, 360 S.E.2d 163, 167 (1987). Thus, as long as the words are not ambiguous, and as long as there is no conflict when the statute is read in conjunction with another, we are restricted to the words used within the statute. As such, under the majority's "plain meaning” approach, we should not look to the many amendments of Code § 18.2-57 and speculate as to the legislative intent behind them.

. The arrest warrants issued to South were styled “Commonwealth of Virginia Warrant of Arrest.” Because the officers’ “authority” to arrest under state law came "[f]rom the City of Norfolk,” and because the officers validly arrested South under color of the authority of the Commonwealth, we must assume they were authorized to do so pursuant to a mutual aid agreement. Moreover, although the majority questions whether these federal officers received the power to issue summons pursuant to a mutual aid agreement, neither the validity of the arrest, nor the officers' power to issue the summons are contested on appeal.

. The majority contends the legal rights afforded these officers would be of the kind addressed in Code § 44-75.T. 1(A), and were not meant to afford these officers special victim status under an "unrelated” criminal statute.